UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
WALMAR ADRIANO SILVA,                          Chapter 7
          DEBTOR.                              Case No. 12-17413-WCH
_____

MARTA FARIA,
          PLAINTIFF,
                                               Adversary Proceeding
v.                                             No. 12-1274

WALMAR ADRIANO SILVA,
          DEFENDANT.
_____


**MEMORANDUM OF DECISION**

## I. <u>INTRODUCTION</u>

The matter before the Court is the Complaint filed by Marta Faria (the "Plaintiff") against Walmar Adriano Silva (the "Debtor") through which she seeks a determination that the debt which the Debtor owes her is excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6).[1]  The Plaintiff contends that during the course of her employment for the Debtor he fraudulently induced her to loan him money and intentionally failed to pay her wages. For the reasons set forth below, I will enter judgment for the Plaintiff in part on Count I and on Count III of the Complaint.

_____

[1] Unless expressly stated otherwise, all references to the "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et. seq.*

## II. <u>BACKGROUND</u>

The parties' dispute arises from a period in 2007 when the Plaintiff worked for the Debtor's corporation, Boston Office Cleaning ("BOC").  In their Joint Pre-Trial Statement, the parties stipulated to a number of the basic facts, but identified disputes concerning the Debtor's payment of wages, the Debtor's solicitation of loans from the Plaintiff, and what inferences can be drawn as to the Debtor's intent.  On October 28th and 29th, 2013, I held a trial at which both parties testified.  Generally speaking, the Debtor's testimony was evasive, and he repeatedly claimed to have no memory of the events at issue.  As such, much of the Plaintiff's testimony stands essentially uncontroverted.  To the extent the parties' accounts differ, I will credit the testimony of the Plaintiff, who testified clearly and consistently to the details of her transactions with the Debtor.

The Debtor, a native of Brazil, was BOC's founder and sole officer and director.[2]  BOC's only client was Capital Cleaning ("Capital"), who subcontracted cleaning jobs to BOC pursuant to a contract the parties executed in 2003.[3]  In October 2005, BOC was servicing eighteen accounts for Capital, including an account at the Hyatt Hotel (the "Hyatt") in Cambridge, Massachusetts.[4]

The Plaintiff, also native of Brazil with only a tenth grade education, was first hired by BOC in April 2006 to work as a housekeeper at the Hyatt.[5]  In October 2006, the Plaintiff left BOC and began working as a manicurist at a beauty salon, but later requested to return in

---

[2] Joint Pre-Trial Statement ("JPTS"), Docket No. 36, ¶¶ 3, 11.

[3] Id. at ¶¶ 13-15.

[4] Id. at ¶¶ 63, 16; Ex. 4.

[5] JPTS at ¶¶ 17, 19; Trans. Oct. 29, 2013 at 14:25; 15:1.

February 2007.[6]  The Debtor agreed to rehire her, and shortly after restarting work at the Hyatt, the Plaintiff was made a supervisor over other housekeepers.[7]  The Plaintiff testified that as a supervisor she earned $600 per week, which the Debtor would pay monthly.[8]  In contrast, the Debtor testified that he believed her wage rate was "$300 to $400 a week," depending on the hotel schedule.[9]

At trial, the Debtor testified that BOC began to encounter financial difficulty at the end of 2006.[10]  By April 2007, the number of accounts BOC was servicing for Capital had dropped to twelve, and in May 2007, BOC was servicing only nine accounts.[11]  At some point in May 2007, the Commonwealth of Massachusetts involuntarily dissolved BOC, for reasons that are not disclosed in the record.[12]  The Debtor testified that he was unaware of the dissolution and continued to conduct business under BOC's name.[13]

On or about May 7, 2007, the Debtor gave the Plaintiff a check (the "April Paycheck") in the amount of $2,054, which represented her wages for April 2007.[14]  The April Paycheck was drawn on a BOC account at JP Morgan Chase Bank.[15]  On May 8, 2007, the Debtor wired

---

[6] JPTS at ¶¶ 20, 23.

[7] JPTS at ¶¶ 21, 24; Trans. Oct 29, 2013 at 15:25; 16:1-3.

[8] Trans. Oct. 29, 2013 at 16:4-8, 21-23.

[9] Trans. Oct. 28, 2013 at 92:23-25; 93:1.

[10] *Id.* at 87:6-8.

[11] JPTS at ¶¶ 64-65.

[12] *Id.* at ¶ 71.

[13] Trans. Oct. 28, 2013 at 62:6-14.

[14] JPTS at ¶¶ 80, 82.

[15] *See* Ex. 1.

$30,000 from a BOC account at Citizens Bank to the Chase Bank account.[16]  From May 8th to

May 11th, thirty-eight checks were drawn on the Chase Bank account, totaling over $40,000.[17]

As a result, when the Plaintiff deposited the April Paycheck, her bank sent her a notice that it

lacked sufficient funds.[18]  Later that month, the Debtor gave $1,000 in cash to the Plaintiff's

aunt, who also worked for BOC, and instructed her to give the money to the Plaintiff.[19]

       The parties stipulated that in late May 2007, the Debtor asked the Plaintiff to lend him

$3,000 (the "May Loan").[20]  When asking for the loan, the Debtor told the Plaintiff only that he

was having personal financial problems.[21]  The Plaintiff testified that this was the first time the

Debtor had requested a loan from her.[22]  She stated that the Debtor drove her to the bank, and she

gave him $3,000 in cash, which was all the money she had.[23]

       According to the Plaintiff, the Debtor promised to pay her back $7,000 in December

2007.[24]  The $7,000 represented the approximately $1,000 still outstanding from the April

Paycheck, the $3,000 in cash just loaned, and her wages for the month of May, which were soon

due.[25]  The Plaintiff testified that the Debtor promised to pay interest on the loan; however, it

---

[16] Trans. Oct. 28, 2013 at 90:17-25; 91:1-21; Ex. 12 at 2; Ex. 14 at 21.

[17] Ex. 14 at 21-22.

[18] JPTS at ¶ 83.

[19] *Id.* at ¶¶ 84-85.

[20] *Id.* at ¶ 92.

[21] *Id.* at ¶ 93; Trans. Oct. 29, 2013 at 19:9-11; 48:1-3.

[22] Trans. Oct. 29, 2013 at 19:12-14.

[23] *Id.* at 48:4-8, 23-25.

[24] *Id.* at 20:2-4.

[25] *Id.* at 19:17-21; 20:2-22.

was unclear whether the $7,000 figure included the interest.[26]   The Plaintiff reported that she

believed the Debtor was an honest man who would pay her back, because he had agreed to rehire

her when she asked him for work.[27]

The Debtor conceded that he approached the Plaintiff to borrow money, but he could not

remember the exact amount of the first loan.[28]   He testified that there were "other times" he

borrowed money from the Plaintiff and repaid her, although he could not remember how many

loans or when they were.[29]   According to him, the Plaintiff charged him interest on the loans of

five to seven percent a month, and he "would pay it back very fast because the interest rates were

really, really high."[30]

The Plaintiff testified that BOC failed to pay her for the months of June and July 2007.[31]

By the start of August, BOC was servicing only three accounts for Capital, and on August 7,

2007, Capital terminated BOC's contract.[32]   The Debtor never attempted to replace the business

that BOC lost from Capital, and BOC ceased to operate.[33]   Upon the closing of the business, the

---

[26] *See id.* at 19:17-23; 20:5-10.

[27] *Id.* at 48:11-19.

[28] Trans. Oct. 28, 2013 at 77:18-19; 93:9-18.

[29] *Id.* at 77:4-7, 11-19; 96:1-4.

[30] *Id.* at 94:22-25; 95:1-3; 96:3-8.

[31] Trans. Oct. 29, 2013 at 21:15-23; 24:4-6; JPTS at ¶ 88.

[32] JPTS at ¶¶ 67, 73.

[33] *Id.* at ¶¶ 68, 74.

Debtor gave away all of BOC's computers and hard copy records.[34]  He stipulated that he no longer remembers the names of the persons to whom he gave them.[35]

At some point in August 2007, the Debtor informed the Plaintiff and other BOC employees that Capital would pay them directly for their final month of work.[36]  Several days later, the Debtor drove the Plaintiff and several of her co-workers to Capital's office.[37] According to the Plaintiff, when he picked her up, the Debtor gave her a check for $2,000 (the "June Paycheck"), which she assumed was her wages for the month of June.[38]  Once they reached Capital's office, Capital gave the Plaintiff a check for $2,980 (the "Capital Paycheck").[39] The Plaintiff testified that this was payment for the month of July and two weeks of August 2007. [40]

The Plaintiff testified that before depositing the June Paycheck and the Capital Paycheck, she called the Debtor to make sure the checks would clear.[41]  The Debtor told her not to deposit the June Paycheck, but to give it to Capital.[42]  The following day, he picked her up and drove her to Capital's office.  On the way, the Debtor began crying and told the Plaintiff that he was about

---

[34] *Id.* at ¶¶ 75, 78.

[35] *Id.* at ¶¶ 76, 79.

[36] *Id.* at ¶¶ 88-89.

[37] *Id.* at ¶ 90.

[38] Trans. Oct. 29, 2013 at 23:17-24.

[39] JPTS at ¶ 91.

[40] Trans. Oct. 29, 2013 at 21:11-14; 22:24-25.

[41] *Id.* at 24:22-25; 25:1-6.

[42] *Id.* at 25:7-10.

to lose his home and that his daughter would be out in the street.[43]  He asked the Plaintiff to loan

him the Capital Paycheck.[44]  The Plaintiff initially refused; however, the Debtor continued to cry

and promised that he would pay the Plaintiff back that Friday—two days later.[45]  The Plaintiff

testified that she then signed the Capital Paycheck and gave it to the Debtor (the "August

Loan").[46]  She stated that she believed the Debtor would in fact pay her back in two days because

she informed him that she needed the money, having no source of income once BOC shut

down.[47]  After arriving at Capital's office, the Plaintiff gave the June Paycheck to a Capital

employee.[48]  The Plaintiff expected Capital to issue a replacement check, but she did not receive

one.[49]

    The Debtor testified that he did not remember whether he ever solicited the Capital

Paycheck as a loan from the Plaintiff.[50]  Nevertheless, he testified that he "believe[d]" he

borrowed money from her twice and that the total amount was "$10,000 at the most," which

corroborates the Plaintiff's account of a $7,000 loan and a $2,980 loan.[51]  The Debtor stated that

when he borrowed from the Plaintiff, he intended to resolve his immediate financial difficulties

---

[43] *Id.* at 25:9-10, 20-25.

[44] *Id.* at 25:16-18.

[45] *Id.* at 26:2-13.

[46] *Id.* at 27:3-6.

[47] *Id.* at 26:14-18.

[48] *Id.* at 27:10-19.

[49] *Id.* at 27:22-25; 28:1-9.

[50] Trans. Oct. 28, 2013 at 99:11-19.

[51] *Id.* at 96:7-8, 14-17.

and then pay her back. [52] He testified that he made interest payments over the course of several months, although he could not remember how many, and that he repaid the Plaintiff over $4,000 in total.[53]

The Plaintiff, on the other hand, disputed the Debtor's account of his repayment.  She testified that she called the Debtor on the Friday that the August Loan came due, and he promised that he would pay, but did not specify when.[54]  She stated that she repeatedly called the Debtor over the next month, asking for her money.[55]  According to the Plaintiff, the Debtor made one payment of $500 in September 2007.[56]  In December 2007, she called to ask about the May Loan, and again the Debtor promised to pay without specifying a date.[57]  She reported that she continued to contact him in January and February 2008, and, after she threatened to sue him, the Debtor paid her $100.[58]

In March 2008, the Fair Labor Division of the Attorney General of the Commonwealth of Massachusetts opened an investigation of the Debtor after at least five former BOC employees filed wage complaints against him.[59]  These third party wage claims were resolved when Capital agreed to pay the employees, and the Attorney General never issued any findings or citations

---

[52] *Id.* at 98:21-22.

[53] *Id.* at 110:15-16; 111:1-4; 96:16-21.

[54] Trans. Oct. 29, 2013 at 28:24-25; 29:1-9.

[55] *Id.* at 29:14-15.

[56] *Id.* at 29:17-20.

[57] *Id.* at 29:21-25; 30:1-6.

[58] *Id.* at 30:10-19.

[59] JPTS at ¶¶ 96-97.

against the Debtor.[60]   At trial, Audrey Richardson, an attorney from Greater Boston Legal Services, testified that she had represented two other BOC employees with wage claims against the Debtor, which were resolved directly with the Debtor after she sent demand letters concerning the claims.[61]

In May 2008, the Plaintiff filed her own wage complaint against the Debtor with the Attorney General.[62]   In September 2008, the parties met at the Attorney General's office, and the Debtor once again promised to pay the Plaintiff everything he owed in monthly installments.[63] The Debtor ultimately made only one payment of $500.[64]

In November 2008, the Plaintiff filed suit against the Debtor in the Brighton District Court for nonpayment of wages, breach of contract, unjust enrichment, and fraud.[65]   In February 2009, the court entered a default judgment against the Debtor in the amount of $34,971.34.[66] Pursuant to orders from the district court, the Debtor paid $1,600 toward the judgment, in monthly payments ranging from $25 to $50.[67]

On September 9, 2012, the Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code.  On October 13, 2012, the Plaintiff filed the Complaint, asserting that her debt is excepted from discharge on three separate counts.  Count I alleged that the May and August

---

[60] *Id.* at ¶ 98.

[61] Trans. Oct. 28, 2013 at 15:14-24.

[62] JPTS at ¶ 99.

[63] *Id.* at ¶ 100.

[64] *Id.* at ¶ 101.

[65] *Id.* at ¶ 108.

[66] *Id.* at ¶¶ 109-110.

[67] *Id.* at ¶ 114.

Loans were induced by fraud pursuant to § 523(a)(2)(A).  Count II alleged that the Debtor committed larceny pursuant to § 523(a)(4) when he took the Capital Paycheck from the Plaintiff. Count III alleged that the Debtor's failure to pay the Plaintiff's wages from April to August 2007 constituted a willful and malicious injury pursuant to § 523(a)(6).  The Debtor filed an answer on November 13, 2012.  After a pre-trial order entered, the parties submitted a Joint Pre-Trial Statement, and the Plaintiff submitted a pre-trial memorandum.  At trial, three witnesses testified and twenty-four exhibits were admitted.[68]   Both the Debtor and the Plaintiff testified in Portuguese through an interpreter.

At trial, the Plaintiff submitted evidence concerning the financial condition of the Debtor and BOC at the time of the events at issue.  The bank records admitted as Exhibits 10, 11, 12, and 14 show that at various times throughout 2007, BOC had checking accounts at Bank of America, Citizens Bank, and JP Morgan Chase Bank.[69]  As set forth in the following table, the accounts were each closed and written off by the respective banks, after the Debtor repeatedly overdrew the accounts and wrote checks with insufficient funds.

---

[68] Notwithstanding any lack of express reference, I have reviewed the entire record, including the docket of this case, *see In re Hyde*, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005) (a court may take judicial notice of its own records), all twenty-four exhibits in evidence, and the trial testimony of each of the three witnesses.  Information that is ultimately irrelevant to my determination of this adversary proceeding and would serve only to further complicate and confuse matters has been intentionally omitted and does not suggest a lack of consideration.

[69] BOC also had an account at Middlesex Savings Bank, about which the Debtor produced no information during discovery. JPTS at ¶¶ 38, 40.

| Account | Month Opened | Month Closed | Months Ending in Negative Balance | Number of Checks Returned | Amount of Bank Write-off |
|---|---|---|---|---|---|
| Bank of America[70] | February 2007 | June 2007 | All | 40 | $3,378.48 |
| JP Morgan Chase Bank[71] | March 2007 | July 2007 | 4 | 15 | $7,962.64 |
| Citizens Bank, account 996-7[72] | May 2007 | November 2007 | 3 | 5 | $315.58 |
| Citizens Bank, account 013-3[73] | June 2007 | November 2007 | All | 21 | $20,406.23 |

The bank records further showed that the Debtor made substantial cash withdrawals from the BOC accounts throughout this time. For example, he made withdrawals from the Chase Bank account totaling $10,000 in March and over $5,000 in April 2007.[74] From the first account at Citizens Bank, he withdrew over $14,000 in August 2007.[75] From the second account at Citizens Bank, he made withdrawals totaling over $17,000 in May, over $25,000 in June, over $4,000 in July, and over $5,000 in August 2007.[76] The Debtor testified that he could not explain the majority of the cash withdrawals[77]; however, he stated that on some occasions he used cash to pay BOC employees after their paychecks had bounced.[78] Nevertheless, the parties stipulated

---

[70] *See* JPTS at ¶¶ 26-28; Ex. 10 at 70-71, 76, and 81.

[71] *See* JPTS at ¶¶ 35-37; Ex. 14 at 15, 22-23, and 29.

[72] See JPTS at ¶¶ at 33-34; Ex. 12 at 7, 12, and 17.

[73] *See* JPTS at ¶¶ 29-31; Ex. 11 at 3, 13, and 18.

[74] Ex. 14 at 6 and 13-15.

[75] Ex. 11 at 18.

[76] Ex. 12 at 2, 6-7, and 16-17.

[77] Trans. Oct. 28, 2013 at 51:20-24; 52:10-17; 53:8-13; 54:17-21; 55:6-14, 19-25.

[78] *Id.* at 45:22-25; 46:6-10; 50:7-24.

the Debtor used BOC funds to pay personal expenses, including vehicle payments and utility bills.[79]

The Debtor's 2006 and 2007 individual tax returns were also submitted as exhibits. The 2006 return listed his and his wife's combined adjusted gross income as $56,625, which included $39,890 from BOC.[80] The 2006 return reported that the Debtor and his wife had paid $40,138 in mortgage interest on their home in Ashland, Massachusetts that year, as evidenced by five mortgage interest statements attached to the return.[81] The Debtor testified that the multiple mortgage statements were the result of refinancings, and it appears that at the end of 2006 the home was subject to two mortgages.[82] The Debtor's 2007 tax return listed his and his wife's combined adjusted gross income as $41,701, which included $22,715 from BOC.[83] The 2007 return stated that they paid $21,771 in mortgage interest that year.[84] In June 2007, the Debtor's home became the subject of a foreclosure proceeding.[85] The Debtor testified that the house was ultimately foreclosed on about the same time that Capital terminated its contract with BOC—in August 2007.[86] He further stated that his and his wife's vehicles, a 2005 BMW sport utility vehicle and a 2005 Infiniti, were repossessed around that time.[87]

---

[79] JPTS at ¶ 70.

[80] *Id.* at ¶¶ 44, 46.

[81] *Id.* at ¶¶ 47, 50.

[82] Trans. Oct. 28, 2013 at 27:24-25; 28:1-8; Ex. 22 at 7-11.

[83] JPTS ¶¶ 52, 54.

[84] *Id.* at ¶ 55.

[85] *Id.* at ¶ 59; Trans. Oct. 28, 2013 at 83:2-8.

[86] Trans. Oct. 28, 2013 at 101:10-20, 25; 102:1.

[87] JPTS at ¶¶ 56-58; Trans. Oct. 28, 2013 at 101:21-25; 102:1.

The Debtor testified that BOC's financial difficulties, and his inability to repay the Plaintiff, occurred because Capital failed to pay BOC all it was owed. He claimed that from the end of 2006 through 2007, Capital missed over $30,000 in payments.[88] Over the entire course of BOC's relationship with Capital, starting in 2003, he estimated that BOC suffered damages of over $100,000.[89] Nevertheless, the Debtor never pursued a claim against Capital, nor did he list any such claim on "Schedule B- Personal Property."[90] Even so, he testified that he "had hopes" that Capital was going to pay what it owed so that he could repay the Plaintiff.[91]

In contrast, the Plaintiff contends that Capital never failed to pay BOC. The Plaintiff submitted deposition testimony from Matthew Collins, a regional manager at Capital who was not available to testify at trial, that Capital did not miss any payments.[92] However, Collins did not work with Capital's hospitality division—the division BOC worked with—and he was not the Capital employee responsible for the BOC contract.[93] The Plaintiff also testified that when the Debtor took BOC's employees to Capital's office to be paid for their last month of work, "Capital arranged for an interpreter and he told us that they had already transferred the money to [the Debtor], but that he didn't pay and that they were paying us for the second time, so we wouldn't have any loss."[94]

---

[88] Trans. Oct. 28, 2013 at 87:24-25; 88:1-4

[89] *Id.* at 87:21-23.

[90] *Id.* at 105:4-6; JPTS at ¶ 62.

[91] Trans. Oct. 28, 2013 at 75:17-23.

[92] *Id.* at 21:24-25; 22:1-3, 13-16.

[93] *Id.* at 23:2-13.

[94] Trans. Oct. 29, 2013 at 24:8-11.

At the conclusion of trial, I took the matter under advisement.  The Plaintiff submitted a post-trial brief on November 20, 2013.

## III. <u>POSITIONS OF THE PARTIES</u>

A. <u>The Plaintiff</u>

The Plaintiff first claims that the Debtor fraudulently solicited the May Loan and the August Loan by falsely stating that he would pay her back.  She contends that the Debtor never intended to repay the loans, as his financial situation at the time could not possibly have permitted him to do so.  The Plaintiff asserts that her reliance on the Debtor's promises to repay was justifiable, given her lack of education, her gratitude to the Debtor for rehiring her, and the fact that when the Debtor solicited the August Loan she had not yet suffered any damages from the May Loan.

As to the larceny count, the Plaintiff argues the Capital Paycheck was her property, and that the Debtor wrongfully took it when he solicited the August Loan.  She asserts that the Debtor's fraud and emotional coercion in inducing her to sign the check over to him vitiated her consent to his taking it.  Again, the Plaintiff contends that the Debtor's financial circumstances at the time of the transaction evidence his intent to permanently retain the Capital Paycheck rather than pay it back.

Lastly, the Plaintiff claims that the Debtor's failure to pay her wages from April to August 2007 was a willful and malicious injury pursuant to § 523(a)(6).  She argues that the frequency of the missed payments and the Debtor's failure to pay other employees show that his conduct was intentional.  The Plaintiff contends that the Debtor had no excuse for failing to pay her, as he was paid in full by Capital each month, and chose to fund an extravagant lifestyle

rather than pay his workers.  She asserts that nonpayment of wages is a type of conduct that inherently causes injury to the employee.

B. <u>The Debtor</u>

The Debtor argues that each time he solicited a loan from the Plaintiff, he fully intended to pay her back.  He claims that Capital owed BOC a substantial amount of money, that he believed Capital would pay the money it owed, and that as such his representations of repayment were not false.  Further, he argues that the evidence of his financial situation shows only that he was not a good businessman, not that he intended to defraud or injure the Plaintiff.  Moreover, he contends that the Plaintiff was fully aware of his financial state when he solicited the loans.

With regard to the larceny count, the Debtor argues that the Plaintiff voluntarily signed over the Capital Paycheck and that he never forced her to do so.  Again, he asserts that he fully intended to repay the Plaintiff for the check.

As to willful and malicious injury, the Debtor asserts that the Plaintiff was an independent contractor, not an employee of BOC, as she was responsible for her own taxes and the Hyatt supervised her work.  As such, he contends that the case law the Plaintiff cites concerning nonpayment of wages is inapplicable.  The Debtor also argues that the Plaintiff submitted no evidence as to what he did with the cash withdrawals from the BOC accounts, and thus there is no proof that he spent the money on lavish personal expenses rather than paying his employees.  Finally, the Debtor contends that his failure to pay the Plaintiff was not intentional, as it stemmed from Capital's breach of its contract with BOC.

## IV. <u>DISCUSSION</u>

### A. <u>Count I: Fraud</u>

Section 523(a)(2)(A) excepts from discharge any debt, "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- false pretenses, a false representation, or actual fraud . . . ."[95]  In order to establish that a debt was obtained by false pretenses, false representation, or actual fraud, the creditor must show that:

(1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;

(2) the debtor intended to deceive;

(3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation;

(5) the creditor's reliance was justifiable; and

(6) the reliance upon the false statement caused damage.[96]

The first two elements of the test describe the conduct and scienter required to show fraudulent conduct, while the last four elements embody the requirement the creditor's claim must arise directly from the debtor's fraud.[97]  The creditor must prove each element by a preponderance of the evidence.[98]

As to the first element, a false representation can include a statement of future intention, such as a promise to act.[99]  A promise to act is a false representation if at the time the debtor

---

[95] 11 U.S.C. § 523(a)(2)(A).

[96] *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (footnote omitted) (*citing Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir.1997)).

[97] *Id.*

[98] *Palmacci*, 121 F.3d at 787 (*citing Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

[99] *Id.* at 786.

made the promise he had no intention of performing.[100]  The second element refers to a different

type of intent—the debtor's intent to deceive, manipulate, or defraud.[101]  "An honest belief, no

matter how unreasonable, that the representation is true and that the speaker has information to

justify it is an insufficient basis for deceit."[102]  Nevertheless, the unreasonableness of the

speaker's belief may be strong evidence that it does not in fact exist.[103]  As the Court of Appeals

for the First Circuit explained in *Palmacci v. Umpierrez*:

> The finder of fact may 'infer[ ] or imply[ ] bad faith and intent to defraud based
> on the totality of the circumstances when convinced by a preponderance of the
> evidence.' Among the circumstances from which scienter may be inferred are: the
> defendant's insolvency or some other reason to know that he cannot pay, his
> repudiation of the promise soon after made, or his failure even to attempt any
> performance.[104]

Although the inquiries are distinct, in many cases the same factors show both the debtor's

knowledge or recklessness as to the falsity of his representation and his intent to deceive.[105]

As to the creditor's reliance, the Supreme Court of the United States has held that

§ 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness.[106]

Under the justifiable reliance standard, "a person is justified in relying on a representation of fact

'although he might have ascertained the falsity of the representation had he made an

---

[100] *Id.* at 787.

[101] *Id.*

[102] *Id.* at 788.

[103] *Id.*

[104] *Id.* at 789 (internal citations omitted).

[105] *Bellas Pavers, LLC v. Stewart (In re Stewart)*, MB 12-017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. Oct. 18, 2012) (*citing Boyuka v. White (In re White)*, 128 Fed. Appx. 994, 998 (4th Cir. 2005)).

[106] *Field v. Mans*, 516 U.S. 59, 70 (1995).

investigation.'"[107]  In determining whether a plaintiff's reliance was justifiable, the court looks to "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case."[108]   Nevertheless, a person "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[109]

### 1.  The May Loan

With respect to the May Loan, the record shows that the Debtor made a false representation of his intent to repay the Plaintiff.  At the time he promised to repay her, the Debtor's personal and business finances were on the verge of collapse.  In May 2007, BOC was servicing only half the number of accounts for Capital that it had in 2005.  All of BOC's bank accounts were running negative balances and numerous checks were being returned for insufficient funds.  Moreover, the Debtor's tax returns show that after paying the mortgage interest on his home, he had only about $20,000 in excess income in both 2006 and 2007.  Given all of these circumstances, the Debtor was at best reckless as to his ability to pay the Plaintiff $7,000 in December 2007.

I also find that the Debtor subjectively intended to deceive the Plaintiff.  The record shows that he was fully aware of his financial situation when he made the promise to repay.  The Debtor conceded that he did not remember any circumstances existing in May 2007 that would justify a belief that he could repay the loan.[110]  The Debtor testified that he intended to use the loans from the Plaintiff to fix his immediate financial needs and then pay her back.  Yet, the

---

[107] *Id.* (*quoting* Restatement (Second) of Torts § 540).

[108] *Id.* at 71 (*quoting* Restatement (Second) of Torts § 545A, Comment *b*).

[109] *Id.* (*quoting* Restatement (Second) of Torts, § 541, Comment *a*).

[110] JPTS at ¶ 95.

Debtor also stated that he made no effort to replace the business BOC was losing.  Thus, any expectation that his financial difficulties were temporary was completely unreasonable.

The Debtor's testimony that he paid the Plaintiff thousands of dollars in interest over the course of several months, if true, would support a finding that he did intend to pay her back. Having assessed both of the parties' trial testimony, however, I credit the Plaintiff's account that the May Loan, including its interest, was not due until December 2007, and that the Debtor failed to make any payment when the debt did come due.  Similarly, I do not credit the Debtor's testimony that Capital owed BOC large sums of money, and that he expected that he could repay the Plaintiff once Capital paid him.  That the Debtor would walk away from a $100,000 claim at a time when he was in dire financial straits is simply incredible.  Moreover, even if Capital did owe BOC money, the Debtor testified that he took no action to recover it.  Thus, any "hope" the Debtor had that Capital would pay him appears wholly unfounded.

As to the other elements of fraud, there is no question that the Debtor's representation of repayment was intended to induce the Plaintiff to lend him money, that she relied on the representations by lending it to him, and that she was harmed when the Debtor failed to pay her all she was owed.  Accordingly, the only remaining question is whether the Plaintiff's reliance on the Debtor's representations was justifiable, and I find that it was.  When the Debtor asked for the loan, he told the Plaintiff only that he was in personal financial need.  Admittedly, the Plaintiff knew that the April Paycheck had bounced and that the Debtor was unable to pay her May wages.  Even so, there is no suggestion that the Plaintiff knew the extent and severity of the Debtor's financial difficulties, and she was under no obligation to inquire into them.  I further note the Plaintiff's position as a subordinate of the Debtor, her low level of education, and her

testimony that her gratitude to the Debtor for rehiring her made her inclined to believe him.[111]

Thus, I find that the falsity of the Debtor's promise to repay was not readily apparent to the

Plaintiff, making her reliance on that promise justifiable.  To the extent the Debtor's debt to the

Plaintiff arises from the May Loan, it is excepted from discharge pursuant to § 523(a)(2)(A).

    2. The August Loan

With regard to the August Loan, the Debtor's knowledge of the falsity of his statement

and his intent to deceive are even more apparent.  By that time, the Debtor's financial situation

had significantly worsened.  In addition to the circumstances outlined above, BOC's contract

with Capital had been terminated, and the Debtor's home was in the final stages of foreclosure.

There was no prospect of other income for him, and no possible reason to believe he could repay

the Plaintiff almost $3,000 two days after borrowing it.

Nevertheless, the falsity of the Debtor's promise to repay the August Loan should have

been evident to the Plaintiff.  When the Debtor solicited the loan, the Plaintiff knew that she and

the other BOC employees had lost their jobs, that BOC had failed to pay her for the month of

June, and that BOC was unable to pay her for the month of July, with Capital paying her instead.

If not aware that BOC had ceased operations, the Plaintiff was at least aware that it was in severe

financial difficulty.  Further, the Debtor informed her that the foreclosure of his home was

imminent.  Thus, there was no basis for believing the Debtor's representation that he would pay

her in two days.  Indeed, the Plaintiff testified that she believed the Debtor would repay her

simply because she had informed him that she needed the money.  The justifiable reliance

standard does not permit a person to ignore the red flags indicating that they are being deceived,

which is exactly what the Plaintiff did in this case.  Accordingly, I find the Plaintiff's reliance on

---

[111] *Cf. Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003) (taking into account a creditor's friendship with the debtor when finding the creditor's reliance on the debtor's false representations was justifiable).

the Debtor's representation that he would repay the August Loan unjustifiable, and the debt resulting therefrom is not excepted from discharge pursuant to § 523(a)(2)(A).

B. <u>Count II: Larceny</u>

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[112]  What constitutes larceny for purposes of § 523(a)(4) is a question of federal law.[113]  Under federal law, larceny is "the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property."[114]  When the owner of property has consented to its taking, the owner cannot use the common law theory of larceny by fraud or trick to prevail under § 523(a)(4).[115]

In this case, the Debtor requested the Capital Paycheck as a loan, and the Plaintiff voluntarily signed it and gave it to him.  Nevertheless, the Plaintiff argues that her consent was negated by the Debtor's fraudulent promise of repayment.  I find this argument without merit. The Plaintiff cannot use the theory of larceny by fraud to circumvent her failure to prove each element of fraud under § 523(a)(2)(A).[116]  The Debtor took the Capital Paycheck with the Plaintiff's consent, and thus did not commit larceny for the purposes of § 523(a)(4). Accordingly, I find that the Debtor is entitled to judgment on Count II.

---

[112] 11 U.S.C. § 523(a)(4).

[113] *Hancock v. Caliri (In re Caliri)*, 335 B.R. 2, 12 (Bankr. D. Mass. 2005).

[114] *Id.* (quoting *Adamo v. Scheller (In re Scheller)*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001)).

[115] *USAlliance Federal Credit Union v. Stinson (In re Stinson)*, 09-12697-FJB, 2012 WL 359917 at *6 (Bankr. D. Mass. Feb. 2, 2012).

[116] *See id.*

C. Count III: Willful and Malicious Injury

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity…."[117] The willfulness element of § 523(a)(6) requires that the debtor either intended the plaintiff's injury or knew that his actions were substantially certain to cause the injury.[118] The malice element requires that the debtor acted "without just cause or excuse."[119] Accordingly, to prevail under § 523(a)(6), a creditor must show by a preponderance of the evidence that:

(1) the creditor suffered an injury;

(2) the injury was the result the debtor's actions;

(3) the debtor intended to cause the injury or that there was a substantial certainty that the injury would occur; and

(4) the debtor had no just cause or excuse for the action resulting in injury.[120]

Here, the Plaintiff contends that the Debtor's failure to pay her wages in April, May, June, July, and August 2007 constituted a willful and malicious injury pursuant to § 523(a)(6).[121] This overstates the extent of the Plaintiff's claim for unpaid wages. The Plaintiff's outstanding wages for April and her May wages were rolled into the May Loan, which I have already found

---

[117] 11 U.S.C. § 523(a)(6).

[118] *Hermosilla v. Hermosilla (In re Hermosilla)*, 430 B.R. 13, 22 (Bankr. D. Mass. 2010) (*citing McAlister v. Slosberg (In re Slosberg),* 225 B.R. 9, 18–19 (Bankr.D.Me.1998)).

[119] *Id.* (*quoting Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997)).

[120] *Id.*

[121] Although the Plaintiff worked for BOC, under the Massachusetts Wage Act a corporate president is liable for a corporation's failure to pay its employees. *See* Mass. Gen. Laws ch. 149, § 148 ("The president and treasurer of a corporation . . . shall be deemed to be the employers of the employees of the corporation within the meaning of this section."). At trial, the Debtor contended that the Plaintiff was an independent contractor, not an employee of BOC. Under Massachusetts law, a worker can only qualify as an independent contractor if the worker performs services outside of the ordinary course of the employer's business. Mass. Gen. Laws ch. 149 § 148B(a)(2). It is undisputed that BOC was a cleaning company and that the Plaintiff's job was to provide cleaning services. Thus, I find that the Plaintiff was an employee of BOC.

nondischargeable.  Capital paid the Plaintiff's wages for July and the beginning of August.  As

such, the Plaintiff did not suffer any injury from the Debtor's failure to pay for those months, and

the first element of the § 523(a)(6) test is not met.  Thus, the only remaining issue is the Debtor's

failure to pay the Plaintiff for the month of June 2007.

Breach of an employment contract through failure to pay wages, by itself, is not enough

to constitute a willful injury.[122]  Rather, the breach must be accompanied by intentional tortious

conduct,[123] which includes fraud or deceit.[124]  In determining whether a failure to pay wages was

intentional, courts have placed emphasis on whether a debtor had the ability to pay his workers,

but chose to divert company funds to personal use instead.[125]  This stands in contrast to a

debtor's failure to pay wages due to business difficulties.[126]

In a recent case in this district, *In re Ruhland*, Judge Feeney discussed the applicability of

§ 523(a)(6) in circumstances similar to the case at hand.  In concluding that the debtor's failure

to pay the plaintiff was willful, the court took into account the debtor's history of wage

violations, the debtor's fraudulent promises to pay the plaintiff the wages he had missed, and the

---

[122] *See, e.g., Orr v. Marcella (In re Marcella)*, 463 B.R. 212, 220 (Bankr. D. Conn. 2011); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1205 (9th Cir. 2001).

[123] *See In re Marcella*, 463 B.R. at 220; *In re Jercich*, 238 F.3d at 1205.

[124] *Chaves v. Ruhland (In re Ruhland)*, 11-19510-JNF, 2013 WL 1088737 at *11 (Bankr. D. Mass. Mar. 13, 2013).

[125]  *See In re Jercich*, 238 F.3d at 1208-09 (finding a debtor's failure to pay was willful when the debtor "knew he owed the wages to [the plaintiff]" and "had the clear ability to pay [the plaintiff] his wages, yet chose not to pay and instead used the money for his own personal benefit."); *In re Ruhland*, 2013 WL 1088737 at *11 (finding a failure to pay wages was willful when, "[t]he Debtor had the ability to pay the Plaintiff for the work he performed but elected instead to use the money to benefit himself personally…").

[126] *See In re Marcella* 463 B.R. 212 at 220 (finding a debt for unpaid wages dischargeable when the failure to pay resulted from a decline in the debtor's business revenues and there was no evidence that the debtor had misused corporate funds).

debtor's use of business revenue for personal expenses.[127]   Similarly, in this case, the number of

other employees that brought wage claims against the Debtor and the Debtor's admission that he

paid employees with checks that had insufficient funds indicate that the Debtor's failure to pay

his employees extended beyond his missed payments to the Plaintiff.   Further, by June 2007,

BOC's accounts with Capital were rapidly diminishing, BOC's checking accounts were running

negative balances of thousands of dollars, and the Debtor had already failed to pay the Plaintiff

her wages for part of April and all of May.   Yet, rather than terminate the Plaintiff, he

fraudulently promised to pay her in December, and retained her services for the month of June,

despite knowing that BOC would almost certainly not have the funds to pay her at the end of the

month.   On top of this, the record indicates that the Debtor diverted the revenue that BOC did

have to his personal expenses, instead of compensating his employees.   Despite BOC's financial

condition throughout 2007, the Debtor reported over $20,000 in income from BOC that year and

paid over $20,000 in mortgage interest on his home.   Moreover, the parties stipulated that the

Debtor used BOC's corporate funds to pay his personal expenses, such as his car payments and

utility bills.   Given all of these circumstances, I find that the Debtor's failure to pay the Plaintiff

in June 2007 was willful.

As to the malice element, I find that the Debtor's conduct was without just cause or

excuse.   The Debtor testified at trial that he failed to pay his employees because Capital had

failed to pay BOC.   As discussed above, I find it incredible that the Debtor would walk away

from a $100,000 claim against Capital, given the financial difficulty he was in at the time.   The

Debtor has not advanced another justification for his conduct.   On the contrary, the evidence

indicates that the Debtor unjustifiably used BOC's funds for his own expenses rather than paying

---

[127] *See In re Ruhland*, 2013 WL 1088737 at *11-12.

24

his employees.    Accordingly, I find that to the extent the Plaintiff's debt arises from the

nonpayment of her June 2007 wages, it is excepted from discharge pursuant to § 523(a)(6).

## IV. <u>CONCLUSION</u>

In light of the foregoing, I will enter judgment in favor of the Plaintiff on Count I of the

Complaint with regard to the May Loan, but not the August Loan.    I will also enter judgment in

the Plaintiff's favor on Count III of the Complaint.[128]    Judgment will enter in favor of the Debtor

on Count II.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: January 21, 2014


Counsel Appearing:

    Peter Cole, Law Offices of Peter Cole, Allston, MA
        for the Plaintiff
    David S. Levinson, Natick, MA
        for the Debtor

---

[128] I note that while I have the authority to determine whether a debt is excepted from discharge under 11 U.S.C. § 523, I have no authority to enter a money judgment in the Plaintiff's favor. *See Am. Express Centurion Bank v. Losanno (In re Losanno)*, 291 B.R. 1 (Bankr. D. Mass. 2003); *Cambio v. Mattera (In re Cambio)*, 353 B.R. 30 (B.A.P. 1st Cir. 2004).  Accordingly, I will not attempt to quantify what portion of the Plaintiff's state court judgment is excepted from discharge.  The Plaintiff may liquidate her claim in whatever state court is the proper venue for such an action.